C. E. Van Devender and Linn Mapel Brannon, Administrator, *De Bonus Non*, Estate of John S. Withers, Deceased, Petitioners, *v.* Commissioner of Internal Revenue, Respondent

Docket Nos. 9069, 9127. Promulgated October 10, 1927.

Rents and royalties received under leases of coal lands constitute gross income, and not proceeds from the sale of a capital asset.

*Jesse L. Cramer, Esq.*, for the petitioners.
*W. H. Lawder, Esq.*, for the respondent.

The Commissioner determined deficiencies in respect of the income tax of C. E. Van Devender and John S. Withers as follows:

| | |
|---|---|
| 1920—C. E. Van Devender | $181.36 |
| John S. Withers | 1,542.78 |
| 1921—C. E. Van Devender | 113.77 |
| John S. Withers | 51.41 |
| 1922—C. E. Van Devender | 260.08 |
| John S. Withers | 123.38 |

and an overassessment of 83 cents in respect of the tax of John S. Withers for the calendar year 1923. Van Devender and Withers were during the taxable years, and had been since 1911, engaged in business as partners. It is claimed in each of these proceedings that the Commissioner erred in including in gross income of each of the petitioners for the taxable years that portion of the distributive share of the income of the partnership of Withers and Van Devender represented by the receipt of royalties under leases of coal lands.

The proceedings were consolidated for hearing and decision. The facts are found as stipulated.

## FINDINGS OF FACT.

For a number of years prior to 1909 and until the death of John S. Withers in 1924, John S. Withers, of Buckhannon, W. Va., and C. E. Van Devender, of Parkersburg, W. Va., were partners in business under the firm name of Withers & Van Devender, each owning a one-half interest in the partnership and the partnership assets. Prior to 1909 the partnership of Withers & Van Devender had acquired certain coal lands lying in Gilmer and Braxton Counties, West Virginia, underlaid with a seam of merchantable coal known as the Pittsburg seam. By means of three separate deeds of lease and agreement, one executed in 1909, one in 1910, and another in 1911, all of the merchantable coal contained in the Pittsburg seam underlying these tracts was leased, let and demised by Withers and Van Devender, as parties of the first part, to certain other persons, as parties of the second part, for terms of 25 years in the case of two of the leases and 35 years, in the case of a third for a consideration of 10 cents per gross ton, there being a stipulation in each case for the payment of a minimum royalty. These leases were all substantially the same and so far as material here provided—

Witnesseth: That the said parties of the first part, in consideration of the rent herein reserved and royalties to be paid, and of the several covenants and agreements by the party of the second part, and upon the conditions and subject to the reservations hereinafter contained, all as hereinafter set out, do lease, let and demise unto the said party of the second part, for the term of twenty-five (25) years from the date hereof, subject to the terms, stipulations and agreements hereinafter contained, for coal mining and coke making purposes only, all the merchantable coal in that certain seam · or vein locally known as the Pittsburg Seam or Vein, in, under and upon the following tract or parcel of land, situate near Gilmer Station, on the Coal & Coke Railway, in the County of Gilmer, and State of West Virginia, on the Little Kanawha River, and bounded and described as follows, * * *.

Together with the right to dig, mine, manufacture into coke and carry away all of the said coal from the said seam, within the said boundary, during the continuance of this lease, without being required to provide or leave support for the overlying strata or surface of the structures thereon, or to springs, wells, cisterns or water-courses therein, or thereon, by reason of mining and removing the whole of the said coal, and all necessary rights and privileges upon the surface for the convenient drainage and ventilation of the mine, and the right to make, maintain and use a track, roads and ways in and to said mines for the transportation, ventilation and drainage of the said coal, and free from all damage by smoke and heat arising to the surface or growing crops from the manufacture of the said coal into coke.

The parties of the first part do also, as appurtenant thereto and not otherwise, lease, let and demise unto the party of the second part, for so long a time as this lease may remain in life, for the purposes of opening and operating

the said coal and the construction of dwelling houses, stores, offices, barns, stables, coke ovens, track sidings, tipples and other structures necessary for the operation of the said coal and the manufacture of the same into coke, so long as the said plant is operated under the conditions herein provided, either under this agreement, or a renewal thereof, or substitute therefor for the working of the coal herein described, and no other purpose, the surface of that part or parcel of lands embraced within the boundaries more particularly bounded and described as follows: * * *.

And, the said party of the second part shall pay an annual rental, for the use and occupancy of the said last described tract of land, including houses, barns, tipples, &c., and the same shall be paid as follows, viz., twelve dollars and fifty ($12.50) cents at the end of each quarter.

But, it is always understood that the aforesaid grants, and each of them, are subject to the right, here reserved to the lessors and their assigns, to enter upon, cut, manufacture and remove all timber thereon, and to occupy so much of the surface of said land as may be necessary for such roads, tram roads and railroads necessary for the removal of same and for the removal of any other timber then owned or thereafter acquired by the grantors herein or any of them, or by their assigns, on any adjoining lands or land in that general locality, so long as the same may not unreasonably interfere with said second party's operations under this lease. * * *

But, it is always understood that the said party of the second part shall, upon the compliance with the provisions of this lease, have the full right to mine, take and carry away said coal from said Pittsburg seam within the boundaries first herein set out, free, clear and fully discharged of all and any liability of the first parties for any damages which may result or happen to said tract of land or to the improvement thereon, by reason of the mining, taking and carrying away of said coal, as well as any loss or damage that may happen or occur to any spring or springs of water veins by reason of said mining, taking or carrying away of said coal.

And, the party of the second part, in consideration of the premises covenants and agrees that he will immediately commence the work of developing the said seam as a coal-producing property, and that he will prosecute the work of development continuously and with diligence; and, further covenants and agrees, during the term aforesaid, unless this lease shall be sooner terminated, under some provision herein, and in such case until such termination, to pay to the said John S. Withers and C. E. Van Devender the following rents and royalties and to do the following things, for the use of the said demised premises and said coal, viz; To pay to the parties last aforesaid fifty ($50.00) dollars per year for the use and occupancy of the surface of the second tract of land hereinbefore described; further, to provide a grade crossing over his railroad track and a convenient road way for the use of said first parties, in going from their lands adjoining said tract to the river, and to allow said first parties, free of charge, use of said roadway, and, in addition thereto, to pay to the said John S. Withers and C. E. Van Devender Ten (10) cents per ton for each gross ton of twenty-two hundred and forty (2240) pounds run-of-mine on all coal mined from said premises, said rents and royalties to be paid monthly, that is to say, on or before the twenty-fifth (25th) day of each month succeeding the end of the month for which royalty is charged; and, the said party of the second part further covenants and agrees that said rents and royalties shall not be less than six thousand and fifty ($6,050.00) dollars for the first year, and seven thousand five hundred and fifty ($7,550.00) dollars for the second and each succeeding year of the term of this lease, same to be

made up at the end of each month of this lease and paid within twenty days thereafter. But, it is expressly agreed and understood that when in any year royalty on coal actually mined on said leased premises at the rates specified does not equal the amount of the minimum rate for said year, then said lessee may, during the next suceeding years, mine (if in excess of the quantity necessary to produce the minimum of such succeeding year) a sufficient quantity of coal without charge to compensation at said royalty rates for such deficiency.

Upon the termination of this lease by the expiration of the term thereof, the party of the second part, may, if all rents and royalties have been fully paid and not otherwise, remove within ninety (90) days next thereafter, but not later, all pit cars, engines, machinery and other movable property placed thereon by them, together with all rails, mining or other machinery, and all houses, buildings, tipples, fixtures and other structures.

And, the said parties of the second part further agree to keep accurate and correct books of account, showing all coal mined or shipped from and coke made upon or shipped from said premises, and in what manner shipped, to which books the lessors, their agents or assigns, shall at all reasonable times have access for the purpose of examination of same and verification of the statement hereinafter provided for; and, the lessors and their agents for like purposes are hereby authorized to demand and require of any railroad company transporting the product off said premises, whether coal or coke, an inspection of their books and records showing the detail, weight and quantity of all such products, and pertinent information thereto; and said carriers and their agents are hereby authorized and requested to show to said lessors and their agents all such records when requested and to furnish all such information on request.

It is further agreed that as to all coal shipped by railroad the railroad weights shall be taken as the basis of settlement for royalties, subject to any correction for any errors at any time found therein; and, in event said coal, or any part of it, shall be marketed or disposed of otherwise, the quantity shall be ascertained by such fair method as may be mutually agreed upon. And the lessee, for himself, his successors and assigns, agrees, on the 25th day of each succeeding month following the ones for which royalty is made up, to furnish to the lessors, or their agents, an accurate statement showing the quantity of coal mined and coke made during each month, such statement to be always subject to revision and correction by the lessors where error be found.

And, it is further understood and agreed that the lessors may, by themselves, or agents, at all reasonable times, go upon said premises and into said mines, and if desired, survey the same for the purpose of determining the quantity of coal mined and coke manufactured and the manner of conducting the mining operations aforesaid.

And the lessee, for himself, his successors and assigns, agrees to conduct said operations in a skillful, provident and workmanlike manner, and in accordance with the laws of the State of West Virginia, and in such manner as to secure the largest yield of coal from said premises and the least loss possible from drawing pillars and from creeps or squeezes or otherwise.

And it is hereby further agreed that if at the expiration of the term of this lease, twenty-five (25) years, all the coal in the said seam so demised shall not have been worked out, then the lessee, at his option, shall have the right to purchase all the coal remaining therein at a price equal to ten ($0.10) cents per gross ton of twenty-two hundred and forty (2240) pounds computed on the basis of the average gross tonnage per acre paid for the coal theretofore mined and removed, the quantity to be determined by accurate survey of the residue satisfactory to both parties, and thereupon the lessor shall convey the coal so

remaining to said second parties, together with the rights herein granted as appurtenant, as aforesaid, save and except said surface right shall continue so long and so long only as said property shall continue to be operated as a coal plant, and said rental of fifty ($50.00) dollars per year shall be paid. And, it is further agreed in event the said second party shall, at the end of said term, purchase and pay for said coal, in that event, and not otherwise, he shall own the improvements he may have placed on said premises for so long a time and no longer as he shall use said surface for said operations and pay said rental therefor, and, in such case, if all obligations to the lessors shall have been satisfied, and not otherwise, he may, on abandonment of said plant for mining purposes, within three (3) months thereafter, and not otherwise, remove the said improvements, fixtures, and machinery, but, in default of such removal within said period, such improvement shall be and remain the property of the lessors without further claim by the lessee.

The said lessee shall employ a competent mining engineer who shall keep all the mine surveys, entries, etc., and make an accurate map, showing the same, from the starting of the mining, which map shall be at all times subject to inspection by the said lessors or their duly authorized agent, who shall also at all reasonable times have the right to enter said mines or have surveys made thereof to determine if all the terms of this lease are fully complied with and for these purposes to use freely the means of access to the said mines and works without hindrance or molestation, and, further shall upon request furnish to said lessors or their agents, copies of said map and all additions thereto from time to time made.

It is further understood and agreed that all taxes during the continuance of this lease assessed upon the said premises shall be borne as follows: The taxes upon the land (not including the improvements) by the lessors, and the taxes upon the improvements thereon, by the lessee, and the taxes on the coal, in the earth, before removal therefrom, by the parties of the first and second part, equally; it being understood and agreed that all such taxes in the first instance be paid promptly by the lessee, he to have the right to deduct from royalties accruing so much of said taxes as the first named parties are entitled to pay and no more. And it is further understood that if either shall at any time pay the taxes hereunder chargeable to the other, which they or either of them may do, then in such case they or either of them shall have recourse therefor upon the party hereunder liable, and the same may be added or deducted from the rents and royalties, as the case may be.

It is further understood and hereby expressly agreed that the lessee herein, as one of the conditions of this lease, shall not engage in the sale of intoxicating liquors upon said premises, or permit such business or sales thereon without the written consent of the parties of the first part.

No assignment, transfer or encumbrance of this lease and agreement, or the leasehold estate thereby created, or any reletting or sub-letting of said premises or any part thereof, shall in any wise release the second party of any obligation here imposed upon or assumed by him, or impair any right or remedy of the first parties as lessors herein against him as a tenant or against such assignees, transferees, or subtenants, or the property of any of them; nor shall the acceptance of rent or royalty from such assignee, transferee or subtenant in any wise operate or be construed to impair or alter the obligations of any of them or liability of the lessee named herein, unless otherwise in writing expressly so agreed by the first parties.

And, it is further agreed that the lessors may from time to time, by writing served on the lessee, appoint to act for them under this lease an agent who

shall have the power in his own name, or that of the lessors at his option, to collect, sue or distrain for rents and royalties from time to time accruing under this lease, and to do all other things in regard to the management and control of the demised premises and interests therein which the lessor might do, and with like effect; the authority of any such agent to continue until notice in writing to the lessee to the contrary; but, this clause is not intended to authorize such agent to change or vary the terms of this lease or to waive any of the provisions thereof.

And, it is further agreed that if said lessee shall fail to pay any installment of rent or royalty when due as hereinbefore provided, that then all rights and remedies accorded landlords under the laws of West Virginia may be resorted to by said lessors; it being understood that the moneys hereinbefore designated as royalties are to be treated as rents reserved herein, and may be distrained for, and the leasehold estate hereby created is made likewise subject to lien for unpaid rents and royalties and is made liable to distrain, levy and sale in like manner as distrainable property upon said premises.

And, for the purpose of increasing the output of the mines, the said lessee further covenants and agrees, within twelve (12) months from this date, to expend at least the sum of five thousand ($5,000.00) dollars on the leased premises in improving and equipping the mines, which sum so to be expended for equipments and improvements shall be other than the ordinary expenses incident to the mining and removal of coal.

And it is further agreed that if default in the payment of any rents or royalties shall continue for the period of two (2) months after the same becomes due, or the lessee shall fail or refuse to keep and perform each and every one of his covenants and agreements herein contained, then in either event the lessors may, at their option, terminate this lease and without further notice re-enter upon and take possession of said premises and every part thereof, and hold and possess the same in like manner as if this lease had never been made, except that such action shall in no wise impair the lessors' right to royalty and rents up to the time of such re-entry, but none shall be charged for any period thereafter. In such cases however, the lessee may within thirty (30) days thereafter remove such removable property placed thereon by him as may then remain upon said premises provided any balance of rents and royalties to such date be first paid; but, such re-entry shall not prevent levy upon sale of any such property for any such balance if said lessors so elect. And the parties of the first part do hereby warrant generally the title to the leasehold estate and the coal in the property above described.

The total net income of Van Devender as finally adjusted and the exemption to which he was entitled for the years 1920 to 1922, inclusive, were as follows:

|  | Total net income | Exemption |
|---|---|---|
| 1920 | $9,060.48 | $2,000.00 |
| 1921 | 2,215.70 | 2,000.00 |
| 1922 | 30,412.31 | 2,000.00 |

The total net income of John S. Withers as finally adjusted and the exemption to which he was entitled, and the dividends and interest on United States obligations included in such total net income for the years 1920 to 1923, inclusive, were as follows:

| | Total net income | Exemption | Dividends | Interest on United States obligations |
|---|---|---|---|---|
| 1920 | $27,108.48 | $2,000.00 | $700.00 | $237.50 |
| 1921 | 5,418.21 | 2,000.00 | 842.00 | 237.50 |
| 1922 | 11,189.34 | 2,000.00 | 1,246.60 | |
| 1923 | 8,606.16 | 2,000.00 | 3,217.00 | |

There has been included in the net income of each of the petitioners, as above stated, for the respective years, his one-half interest in the net amount of royalties collected from the three coal properties after deducting depletion upon actual production, the rate of which had been established at $3\frac{1}{3}$ cents per ton of coal mined, as set forth in the following tabulation:

FOR THE YEAR 1920

| | Copen Creek | Gilmer fuel | McCaa | Total |
|---|---|---|---|---|
| Royalties received | $4,842.41 | $2,680.34 | $6,234.68 | $13,757.43 |
| Bonus on coal earnings | | | 640.98 | 640.98 |
| Total | 4,842.41 | 2,680.34 | 6,875.66 | 14,398.41 |
| Depletion | 1,614.03 | 893.35 | 2,078.13 | 4,585.51 |
| Net | 3,228.38 | 1,786.99 | 4,797.53 | 9,812.90 |
| Deduct: Adjustment in depletion, Commissioner's letter July 21, 1925 | | | | .28 |
| Adjusted net | | | | 9,812.62 |
| Taxpayer's one-half | | | | 4,906.31 |

FOR THE YEAR 1921

| | Copen Creek | Gilmer fuel | McCaa | Total |
|---|---|---|---|---|
| Royalties received | $3,398.89 | $242.00 | $1,783.40 | $5,424.29 |
| Excess royalties paid | | | 3,318.79 | 3,318.79 |
| Royalty forfeited for 1918, less overproduction, 1920 | | | 1,509.75 | 1,509.75 |
| Total | 3,398.89 | 242.00 | 6,611.94 | 10,252.83 |
| Depletion | 1,132.96 | 80.67 | 594.47 | 1,808.10 |
| Net | 2,265.93 | 161.33 | 6,017.47 | 8,444.73 |
| Add: Depletion disallowed Commissioner's letter July 21, 1925 | | | | .18 |
| Adjusted net | | | | 8,444.91 |
| Taxpayer's one-half | | | | 4,222.46 |

FOR THE YEAR 1922

| | Copen Creek | Gilmer fuel | McCaa | Total |
|---|---|---|---|---|
| Royalties received | $5,174.38 | $3,170.60 | $7,255.15 | $15,600.13 |
| Royalties forfeited for 1919, less overproduction, 1922 | | | 2,521.43 | 2,521.43 |
| Total | 5,174.38 | 3,170.60 | 9,776.58 | 18,121.56 |
| Depletion | 1,724.79 | 1,056.86 | 2,418.39 | 5,200.04 |
| Net | 3,449.59 | 2,113.74 | 7,358.19 | 12,921.52 |
| Add: Depletion disallowed, Commissioner's letter, July 21, 1925 | | | | .51 |
| Adjusted net | | | | 12,922.03 |
| Taxpayer's one-half | | | | 6,461.02 |

FOR THE YEAR 1923

|  | Copen Creek | Gilmer fuel | McCaa | Total |
|---|---|---|---|---|
| Royalties received | $4,893.53 | $4,120.64 | $5,966.72 | $14,980.89 |
| Depletion | 1,631.18 | 1,373.54 | 1,988.91 | 4,993.63 |
| Net | 3,262.35 | 2,747.10 | 3,977.81 | 9,987.26 |
| Add: Depletion disallowed, Commissioner's letter, July 21, 1925 | | | | .50 |
| Adjusted net | | | | 9,987.76 |
| Taxpayer's one-half | | | | 4,993.88 |

The amount of royalties and rents received under the leases was included by the Commissioner in gross income of the partnership and treated as a part of the distributive share of the profits of the partners, the petitioners herein.

OPINION.

LITTLETON: Petitioners claim that the royalties received under the coal leases did not represent income but represented the return to them of capital and that the leases constituted a sale of the coal which constituted a part of the real estate. Petitioners refer to numerous court decisions which they claim support their contention in this regard. We deem it unnecessary to enter into an extended discussion of the contentions advanced, since this question has been before the Board in the proceeding of *Henry L. Berg*, 6 B. T. A. 1287, and of *John T. Burkett*, 7 B. T. A. 560, wherein a similar contention was advanced. In those cases we held that rents and royalties received under oil leases constituted income and that the Commissioner was correct in so holding. See *Rosenberger* v. *McCaughn*, 20 Fed. (2d) 139, District Court, Eastern District of Pennsylvania. We think the Commissioner's determination, which is questioned in these proceedings, was also correct. Compare *United States* v. *Ludey*, 274 U. S. 295.

*Judgment will be entered for the respondent.*

Considered by SMITH and LOVE.